

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00150-CR

———————————————

LEONARD STANSBERRY, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F16-216-362

Before Gabriel, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Gabriel

**MEMORANDUM OPINION**

Appellant Leonard Stansberry appeals his conviction for murder and resulting twenty-five year sentence. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). In five points, he argues the trial court reversibly erred by denying his pretrial motions to suppress evidence and by admitting certain expert testimony from a Texas Ranger and the medical examiner during his trial. We affirm.

## I. BACKGROUND

On March 7, 2015, Stansberry called 911 and reported that he needed an ambulance to respond to his residence. Throughout the duration of the six-minute and forty-eight second phone call, the 911 dispatcher repeatedly asked Stansberry to tell her what had happened, but he never did. Both police and paramedics were dispatched to the residence. When the paramedics arrived, Stansberry emerged from his garage and said that Kenicqua Cherry—who went by Kiki and whom he had been dating for about a year—had shot herself. The paramedics ultimately transported Kiki to the hospital where she was pronounced dead from a single gunshot wound to her chest.

Following an extensive investigation, law enforcement officers concluded that Kiki had not shot herself like Stansberry said. Rather, they believed the evidence showed that Stansberry had shot her. A grand jury indicted Stansberry for murder. *See id.* § 19.02(b)(1), (2). A jury found him guilty and assessed his punishment at twenty-five years' confinement, and the trial court sentenced him accordingly.

## II. THE TRIAL COURT DID NOT ERR BY DENYING STANSBERRY'S PRETRIAL MOTIONS TO SUPPRESS

In his first two points, Stansberry argues the trial court erred by denying two suppression motions. We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

### A. MOTION TO SUPPRESS VIDEO OF POLICE INTERVIEW

In his first point, Stansberry argues the trial court erred by partially denying his pretrial motion to suppress a video recording of a police interview he voluntarily attended with his lawyer.

### 1. THE EVIDENCE AT ISSUE

On March 7, 2015, the day Kiki was shot, Stansberry voluntarily submitted to an interview with Detective Scott Miller at the Denton police department. Detective Miller interviewed Stansberry again on March , and then again on July 22. All of these interviews were video recorded, and Stansberry's motion sought to prevent all three

3

interviews from coming into evidence at trial. However, Stansberry's first point involves only the trial court's ruling regarding the March 18 interview.

Stansberry attended the March 18 interview with his lawyer, and the recording of that interview is approximately one hour and sixteen minutes. Neither Stansberry nor his lawyer were informed that the interview was being video recorded. During the interview, Detective Miller stepped out of the room on two occasions, but the video recording equipment continued recording the room in his absence. On the first occasion, approximately eight minutes and twenty-six seconds elapsed from the time Detective Miller left the room until the time he returned. Both Stansberry and his lawyer remained in the interview room during this time, and they spoke with each other during some of it.

When Detective Miller returned, the interview resumed until approximately the forty-four minute, twenty-one second mark, at which point some cordial discussion continued between Detective Miller and Stansberry's lawyer that did not involve the details of this case. That off-topic discussion continued for a few minutes, and then Detective Miller stepped out of the room again, this time for just over a minute. Stansberry and his lawyer again chatted during Detective Miller's brief absence before Detective Miller returned and asked Stansberry's lawyer to join him outside the interview room. Stansberry's lawyer complied, leaving Stansberry alone in the interview room for approximately twenty-five minutes before Stansberry was

4

informed he was free to leave. Stansberry moved to suppress the video of the March 18 interview in its entirety.

## 2. THE SUPPRESSION HEARING

At the suppression hearing, the State indicated that it intended to introduce a redacted portion of Stansberry's March 18 interview but that it did not intend to introduce any portion of the video showing Stansberry and his lawyer during Detective Miller's first absence or any portion of the video past the forty-four minute, twenty-one second mark.[1] Stansberry, however, objected to the admission of any portion of the March 18 interview, arguing that the entire video had to be suppressed under article 38.23 of the code of criminal procedure because portions of the video captured communications in violation of Texas law. Specifically, Stansberry complained the video was recorded in violation of (1) penal code section 16.02(b) because it captured oral communications between his lawyer and him at times when the person making the recording was not a party to those communications; and (2) the attorney-client privilege because it captured communications between Stansberry and his lawyer.

At the suppression hearing, Detective Miller testified that he arranged the March 18 interview, which he conducted in one of the Denton police department's

---

[1]Because Detective Miller's second absence occurred after the forty-four minute, twenty-one second mark in the video, it follows that the State implicitly represented that it did not intend to introduce any part of the video showing Stansberry and his lawyer during Detective Miller's second absence.

5

interview rooms. Detective Miller stated that he recorded the interview on video and never told Stansberry or his attorney that he was doing so. He testified that he conducted the interview "with the sole purpose of trying to secure a piece of evidence, that being a tape-recorded conversation that [he] had." Detective Miller agreed that he twice left the interview room during the interview and that he left the video recording equipment running during the times he was out of the interview room. He further testified that he recorded oral communications between Stansberry and his lawyer; intentionally intercepted those oral communications via the video recording equipment; and intentionally disclosed the contents of the intercepted oral communications to the district attorney.

After reviewing the entire video of the interview and considering the testimony presented at the hearing, the trial court denied Stansberry's motion as to the portion of the video starting at the beginning through the point that Detective Miller left the room the first time, and it granted Stansberry's motion as to the portion after that point.[2] During trial, over Stansberry's renewed objections, the trial court admitted, and the State published to the jury, the portion of the interview up to the point where Detective Miller left the room the first time.

---

[2]Specifically, the trial court ruled that "with regards to anything prior to 23 minutes 36 seconds, at which point the investigator leaves, that the motion to suppress with regard to that is denied. From that point forward in the interview, the motion to suppress is granted."

### 3. ANALYSIS

On appeal, Stansberry argues the trial court should have suppressed the entire video based on code of criminal procedure article 38.23(a). As applicable here, article 38.23(a) bars the admission of evidence that a police officer obtained in violation of any Texas law. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2018). Stansberry argues two violations of Texas law occurred in connection with the video recording. He contends Detective Miller captured communications between him and his lawyer in violation of penal code section 16.02(b) and in violation of the attorney-client privilege.

Importantly, Stansberry does not contend the trial court admitted any portion of the video where Detective Miller was not present in the room.[3] Nor does he argue that the portion of the video admitted at trial itself was recorded in violation of penal code section 16.02(b) or the attorney-client privilege.[4] And Stansberry does not cite us to any authority for the proposition that article 38.23(a) requires a trial court to suppress an entire video where only a portion of the video was obtained in violation of State law.

Article 38.23(a) bars the *admission* of evidence that a police officer obtained in violation of Texas law. *See id.* As we have noted, throughout the entire portion of the

---

[3]As noted above, the trial court did not do so.

[4]And even if we were to construe his brief as making this argument, as we discuss below, that argument would be unpersuasive.

7

video that the trial court admitted at trial, Detective Miller was present in the interview room and a party to the communications. For that reason, that portion of the video did not violate the attorney-client privilege or penal code section 16.02(b), the only violations of Texas law that Stansberry alleges. *See* Tex. Penal Code Ann. § 16.02(c)(3), (4) (West Supp. 2018) (providing generally that "[i]t is an affirmative defense to prosecution under Subsection (b)" that the person who intercepted an oral communication was a party to the communication); *Williams v. State*, 417 S.W.3d 162, 185–86 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (noting the attorney-client privilege applies to "confidential" communications, that is, communications that are "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client"). Consequently, article 38.23(a) did not bar the admission of that portion of the video at trial, and thus, the trial court did not err by denying Stansberry's motion to suppress as to that portion of the video.

We overrule Stansberry's first point.

### B. MOTION TO SUPPRESS CRIME SCENE RECONSTRUCTION

In his second point, Stansberry argues the trial court erred by denying his pretrial motion to suppress photographs and measurements investigators took, as well as a crime scene reconstruction that investigators conducted, pursuant to a search warrant.

8

## 1.  THE EVIDENCE AT ISSUE

At the suppression hearing, Detective Miller testified that on March 12, 2015, five days after the shooting, he obtained a search warrant to search Stansberry's house.  In executing the search, the police seized a laptop, a thumb drive, and a portion of the drywall where the bullet that had struck Kiki had come to rest.  They also performed gunshot residue testing and tested for the presence of blood.  Of particular importance to this appeal, Detective Miller also testified that investigators "had taken measurements and photographs and did some reenactment of the shooting to try to get . . . an angle consistent with what the medical examiner was telling us."  Based on their reconstruction, investigators concluded that Kiki had not shot herself as Stansberry had stated but rather that she had been shot while opening the door to, and entering, Stansberry's bedroom by someone who was sitting on the bed.  Stansberry moved to suppress anything the police did during the March 12 search other than seizing the laptop and thumb drive.

## 2.  THE SUPPRESSION HEARING

At the hearing, Stansberry took issue with the search not with regard to the seized laptop and thumb drive but with regard to the additional investigation police conducted while in the house, including their testing for gunshot residue, the testing for the presence of blood, the scene reconstruction, and the additional photographs and measurements taken at the scene.  He asserted that chapter 18 of the code of criminal procedure governs the issuance of search warrants and that chapter 18 does

not allow a magistrate to issue a search warrant that authorizes police officers to conduct further investigation of a crime scene. Stansberry argued the police used an ostensibly valid purpose for obtaining a search warrant—to search for and seize items—as a pretext for their true intent: to get back inside Stansberry's house to conduct an unlawful investigation. Based on his contention that the State conducted the additional investigation under "false pretenses," Stansberry requested the trial court to suppress anything that transpired during the search other than the seizure of the laptop and thumb drive.

The prosecutor responded by pointing to two portions of Detective Miller's search warrant affidavit. First, the prosecutor noted that Detective Miller had specifically alleged that there was certain evidence at Stansberry's house, and after specifically listing blood, hair, saliva, bodily discharge, gunshot residue, bloody clothing, cell phones, computers, computer tablets, and data storage devices, Detective Miller's affidavit added the phrase "and other evidence associated with the ongoing death investigation" involving Kiki. Second, the prosecutor noted that Detective Miller's affidavit specifically requested that a search warrant be issued "to obtain additional measurements, additional photograph and crime scene processing using blue star to recover latent blood evidence to either confirm or disprove Stansberry's version of the shooting." The prosecutor maintained that these portions of the affidavit expressly authorized investigators to perform the additional measurements, take additional photographs, conduct the crime scene reconstruction,

10

and test for blood and gunshot residue. And the prosecutor argued that because the search warrant expressly authorized investigators to do those things, Stansberry's assertion that they used the search warrant as a pretext to do an unlawful investigation was incorrect.

The trial court denied Stansberry's motion to suppress the evidence investigators obtained pursuant to the search warrant. At trial, over Stansberry's objections, the trial court admitted evidence of the investigators' additional March 12 investigation, including evidence of the scene reconstruction, photographs, and measurements.

### 3. ANALYSIS

On appeal, Stansberry frames his point as one attacking the validity of the search warrant. Relying on *Groh v. Ramirez*, 540 U.S. 551 (2004), Stansberry asserts that the search warrant was invalid because it failed to describe the items to be seized with sufficient particularity. *See* U.S. Const. amend IV (providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, *and the persons or things to be seized*" (emphasis added)).

In the first place, we question whether Stansberry preserved this complaint. *See Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016) (noting that preservation of error is a systemic requirement that appellate courts should review notwithstanding whether it is raised by the parties). Among the rules of error preservation is the rule requiring that the complaint made on appeal must comport

11

with the complaint made in the trial court. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.").

In the trial court, Stansberry argued the March 12 scene reconstruction, measurements, and photographs had to be suppressed because code of criminal procedure chapter 18 does not authorize police to obtain, or a magistrate to issue, a search warrant for the purpose of conducting additional investigation of a crime scene. On appeal, however, Stansberry now argues that the scene reconstruction, measurements, and photographs should have been suppressed because the search warrant failed to list those items with sufficient particularity. Thus, Stansberry's appellate complaint does not comport with his complaint at trial.

But even assuming Stansberry preserved his second point, he nevertheless would not prevail. As we read Stansberry's brief, it appears that he first suggests, relying on *Groh*, that the warrant itself lacks sufficient particularity. While stating that "[t]he law permits [search warrant] affidavits to be incorporated by reference to amplify the particularity requirement of the warrant," Stansberry also asserts, citing *Groh*, that "the Fourth Amendment requirement is particularity in the warrant, not the supporting documents." We note that Stansberry is mistaken to the extent he argues

12

that, under *Groh*, we may only look to the search warrant itself to determine whether it satisfies the Fourth Amendment's particularity requirement.

*Groh* involved the government's search of a residence pursuant to a warrant that did not describe the persons or things to be seized. *Groh*, 540 U.S. at 553. Though the warrant application, supported by a detailed affidavit, described the things to be seized with particularity, the warrant itself failed to do so, and the warrant also failed to incorporate by reference the itemized list of things to be seized that was detailed in the application. *Id.* at 554–55. The Supreme Court concluded that the fact that the items to be seized had been adequately described in the warrant application did not rescue the warrant's failure to comply with the Fourth Amendment's mandate that a warrant "particularly describe[] the place to be searched, and the persons or things to be seized." *Id.* at 557 (quoting U.S. Const. amend. IV (emphasis omitted)). The Court was quick to add, however, that it was not holding that the Fourth Amendment prohibits a warrant from cross-referencing other documents. *Id.* But the warrant at issue in *Groh* did not incorporate the warrant application or the accompanying affidavit by reference, and thus the Supreme Court held the warrant was invalid for lack of particularity. *See id.* at 557–58.

Unlike the warrant in *Groh*, the warrant here expressly incorporated Detective Miller's search warrant affidavit, and thus, in assessing Stansberry's assertion that the warrant failed to satisfy the Fourth Amendment's particularity requirement, we consider the affidavit and the warrant together. *See Affatato v. State*, 169 S.W.3d 313,

13

316–17 (Tex. App.—Austin 2005, no pet.). In doing so, we ask whether an executing officer reading the description in the warrant and affidavit would reasonably know what items are to be seized. *Porath v. State*, 148 S.W.3d 402, 410 (Tex. App.—Houston [14th Dist.] 2004, no pet.). But the requirements for a sufficiently particular description can vary according to the thing being described. *Gonzales v. State*, 577 S.W.2d 226, 228 (Tex. Crim. App. [Panel Op.] 1979).

We turn to Stansberry's argument for why there was insufficient particularity in the warrant and incorporated affidavit to satisfy the Fourth Amendment. He asserts that before searching his house, investigators knew that they wanted to follow up on questions the medical examiner had raised about the trajectory of the bullet that struck Kiki. He contends that Detective Miller therefore "could have included in [his] affidavit and [his] application for the search warrant the additional testing, photographs, measurements[,] and re-enactment using the medical examiner information but failed to do so." And had he done so, Stansberry concedes, the magistrate "would have given the [investigators] authority to conduct the search which would have complied with the particularity requirements of the Fourth Amendment."

Stansberry is mistaken in both his claim that Detective Miller's search warrant affidavit failed to describe his concerns, based on information from the medical examiner, regarding the trajectory of the bullet and his claim that the affidavit failed to

14

include the additional investigation he sought to perform regarding the bullet's trajectory.

In his search warrant affidavit, Detective Miller averred that Stansberry told investigators on the day of the shooting that Kiki had stepped into the bedroom and shot herself, and Stansberry indicated that she had the gun in her right hand when she did so. Detective Miller also stated that the medical examiner who performed Kiki's autopsy questioned whether she had shot herself. Detective Miller said that the medical examiner had concluded that the bullet that struck Kiki "entered near the top of [her] left breast and exited approximately three inches on a downward angle out her mid right back." He averred that angle was not typical to a right-handed individual shooting herself. Detective Miller also stated that after the bullet exited Kiki's back, it ultimately came to a rest about fifty-seven inches up a wall that was behind her. Detective Miller averred that based on the trajectory of the bullet, and Stansberry's assertion that Kiki had been inside the bedroom when she shot herself, he had concerns "as to the angle [Kiki] had to be in to cause the bullet to travel in the direction noted and ending up in the wall at the height photographed." Detective Miller requested that a search warrant be issued "to obtain additional measurements, additional photograph[s,] and crime scene processing using blue star to recover latent blood evidence to either confirm or disprove Stansberry's version of the shooting."

Thus, contrary to Stansberry's assertion, Detective Miller's search warrant affidavit did explain his concerns regarding the bullet's trajectory and whether it was

consistent with Stansberry's claim that Kiki had shot herself, and it further explained those concerns were based in part on the medical examiner's own, independent concerns about whether the bullet's trajectory was consistent with Kiki shooting herself. Also contrary to Stansberry, Detective Miller's affidavit requested that a search warrant be issued expressly for the purpose of obtaining additional measurements, additional photographs, and crime scene processing to "either confirm or disprove Stansberry's version of the shooting"—that is, to either confirm or disprove Stansberry's claim that Kiki shot herself.

In sum, as we have noted, the search warrant expressly incorporated Detective Miller's affidavit for all purposes. *See Groh*, 540 U.S. at 557–58; *Affatato*, 169 S.W.3d at 316–17. Detective Miller's affidavit stated that he had concerns about the bullet's trajectory that were in part based upon the medical examiner's skepticism as to whether the trajectory of the bullet was consistent with Kiki having shot herself. And Detective Miller's affidavit described that investigators intended to seize measurements, photographs, and information gleaned from additional crime scene processing that specifically related to the trajectory of the bullet that struck Kiki to determine whether she had shot herself as Stansberry claimed. We conclude that Detective Miller's affidavit, which the search warrant incorporated, was sufficiently particular to authorize the photographs and measurements that investigators took, as well as the crime scene reconstruction they performed, during the March 12 search.

We overrule Stansberry's second point.

16

# III. STANSBERRY'S COMPLAINTS REGARDING THE ADMISSIBILITY OF EXPERT TESTIMONY

In his third, fourth, and fifth points, Stansberry argues the trial court erred by admitting certain portions of testimony from Texas Ranger Clair Barnes and medical examiner Tasha Greenburg, arguing those portions of testimony constituted expert opinion testimony that was inadmissible under Rule 702 of the Texas Rules of Evidence. Because each of those points is subject to the same standard of review, we set forth the applicable standard of review once and refer to it as necessary in considering each of those points.

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017). Under that standard, we will not disturb the trial court's ruling so long as it falls within the zone of reasonable disagreement. *Id.* Even if we conclude that a trial court's evidentiary ruling was an abuse of discretion, we will not reverse the trial court's judgment if the error was harmless. *See* Tex. R. App. P. 44.2; *Bosquez v. State*, 446 S.W.3d 581, 585 (Tex. App.—Fort Worth 2014, pet. ref'd). Because Stansberry asserts nonconstitutional error, in the event we find such error, we will disregard it unless it affects a substantial right, that is, it had a substantial and injurious effect or influence in determining the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Bosquez*, 446 S.W.3d at 585.

## A. RANGER CLAIR BARNES'S TESTIMONY

Stansberry's third and fourth points challenge portions of Ranger Barnes's testimony, and because these points overlap, we consider them together.

### 1. Relevant Facts

A little more than two months before trial, the State disclosed to Stansberry that it intended to call Ranger Barnes as an expert at trial. Stansberry does not argue, and our review of the voluminous record does not reveal, that Stansberry filed any pretrial motions, or made arguments at any pretrial hearings, challenging Ranger Barnes's testimony under Rule 702.

Ranger Barnes testified that the Texas Rangers generally assist other law enforcement agencies with major criminal investigations. He stated that in his role as a Texas Ranger, his primary responsibility was to provide assistance in Denton County, that he assisted in homicide investigations, and that he performed all of the officer-involved shooting reconstructions that resulted in injury or death within Denton County. Ranger Barnes testified that he assisted with the investigation of this case at the request of the Denton Police Department.

During one portion of his testimony, Ranger Barnes opined that based on the scene reconstruction investigators performed on March 12, the trajectory of the bullet that struck Kiki was inconsistent with Stansberry's story that Kiki shot herself. In his third point, Stansberry argues the trial court erred by admitting this testimony because it was an opinion that had to be given by a ballistics expert under Rule 702, Ranger

Barnes did not qualify as such an expert, and even if he did, his methodology was insufficiently reliable to be admitted under Rule 702.

In another portion of his testimony, Ranger Barnes stated that the stippling pattern—an injury to the flesh that is caused by unburned gunpowder or propellant when a gun has been fired at close range to the victim—that appeared on Kiki's body did not match Stansberry's story that Kiki shot herself. In his fourth point, Stansberry argues the trial court erred by admitting this testimony because it could only be given by an expert under Rule 702, and Ranger Barnes's opinion was insufficiently reliable to be admitted under Rule 702.

The State replies to both points by arguing that Stansberry failed to preserve them. Having thoroughly reviewed the record, we conclude the State is correct.

## 2. Applicable Law

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013). A reviewing court should not address the merits

19

of an issue that has not been preserved for appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

Moreover, to preserve error, a party generally must continue to object each time the objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.). And a trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)); *Lane v State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).

### 3. The Challenged Testimony

On direct examination, Ranger Barnes stated that when he went to Stansberry's house on March 7, he did not believe Stansberry's story "add[ed] up" because based on his training in crime scene and shooting reconstruction, he thought the trajectory of the bullet was unusual. The prosecutor asked him to define "trajectory," and Ranger Barnes replied that it meant "the bullet['s] flight path." When the prosecutor thereafter asked Ranger Barnes to explain why he thought the trajectory of the bullet did not match Stansberry's story, Stansberry, with the jury still present, took him on voir dire and ultimately objected, stating, "I'm going to object to any type of expertise

20

questions unless they can establish that he's an expert in the field of ballistics." The trial court stated, "For any ballistics questions, I'll sustain that objection." Stansberry did not request a running objection. Immediately thereafter, Ranger Barnes continued testifying, without objection, that based on his observations on March 7, if Kiki had shot herself in the manner that Stansberry had said, the bullet's trajectory would have been different.

When the prosecutor indicated that she was about to shift the line of questioning to the scene reconstruction investigators conducted on March 12 pursuant to the search warrant, Stansberry objected again, stating, "Judge, for all the reasons previously stated outside the jury's presence, I'm going to object to this line of questioning." The trial court overruled the objection. Stansberry asked for a running objection "so as to not interrupt the prosecutor after each question with regard to March 12th," a request the trial court granted.

Without further objection, Ranger Barnes testified to the following. Investigators sought a search warrant because they wanted to get back inside Stansberry's house and attempt to recreate the shooting. Ranger Barnes assisted other investigators in executing the search warrant. Once inside, they performed a scene reconstruction, which involved the use of cameras, trajectory kits,[5] lasers, and a

---

[5]A trajectory kit, according to Ranger Barnes, is "a series of rods that can be screwed, threaded together. Some of them have lasers that you attach on one end of the rods, some others have strings. There's a tool for measuring angles, those types of things."

21

dummy pistol equipped with a laser, in an effort to determine the trajectory of the bullet that struck Kiki.

Ranger Barnes then testified about how investigators performed the scene reconstruction. They knew the angle at which the bullet entered into the front of Kiki's torso, the height at which it exited her back, and the height at which it came to rest in the wall behind her. They placed a trajectory rod into the bullet hole that was in the wall and attached a string to it. When Ranger Barnes then began to explain that they used one of the investigators, Detective Dan Conrad, as an analogue to Kiki because he and Kiki were approximately the same height, Stansberry took Ranger Barnes on voir dire and objected "to any questioning with regard to some type of crime scene reconstruction unless we can establish, one, that he's got accurate measurements before he did any type of whatever they did on March 12th, 2015; and, two, can establish him as some type of an expert in this field." The trial court overruled those objections, and Stansberry did not request a running objection.

Without further objection, Ranger Barnes continued testifying. Because Detective Conrad was approximately the same height as Kiki, investigators placed pieces of tape on him where the bullet's approximate entry and exit points were on Kiki. Using the taped entry and exit points on Detective Conrad as an analogue to Kiki, investigators determined the point of the bullet's origin by tracing the flight path the bullet would have had to travel in order to hit Kiki in the torso where it did, exit her back where it did, and hit the wall where it did. In conducting the reconstruction

22

in this fashion, investigators tried to prove Stansberry's story was true, but they were never able to get his story to "line up." Specifically, according to Ranger Barnes, investigators could not reconstruct a scenario where the angle of entry into Kiki's body would result from Kiki having the gun in her right hand and shooting herself. He also opined that Kiki could not have shot herself at close range using her left hand because there was no muzzle impact on her body, which would have been present had she shot herself using her left hand. And he stated that there was no additional evidence that would suggest Kiki's wound resulted from a close contact gunshot wound.

The prosecutor then asked Ranger Barnes to describe a close contact gunshot wound. He testified that in a close contact gunshot wound where the muzzle is up against the body, the body will have burns because when the gun discharges, it is essentially an explosion. He also said that when a gun fires, some of the gunpowder will not be burned up, so if the gunshot is at close range, the victim's body will contain unburned gunpower. Ranger Barnes further stated that if the gun's muzzle is up against the body when fired, the victim's skin would have tearing. And according to Ranger Barnes, the closer the muzzle is to the body when fired, the more those types of injuries and defects would be present. At this point, Stansberry again took Ranger Barnes on voir dire and ultimately objected, stating, "I believe we're on an area that this witness cannot properly answer these questions. It's beyond his realm of

knowledge, and I object on those grounds." The trial court overruled that objection, and Stansberry did not request a running objection.

Ranger Barnes then continued, stating again that the closer the gun's muzzle is to the body when fired, the more damage it will do and the more defects such as powder burns would be present on the body. The prosecutor asked him to explain what "stippling" was, and Ranger Barnes stated that it was "an injury to the flesh, and it's caused normally by unburned gunpowder or propellant. It's hot. It's hot enough to burn, but it doesn't burn off in the discharge of the projectile, discharge of the bullet."

The prosecutor then switched the line of questioning and asked whether investigators were eventually able to construct a scenario of the bullet's trajectory where the entry wound, exit wound, and the bullet hole in the wall all lined up. Ranger Barnes said they had and explained that scenario had Kiki opening the master bedroom door and stepping inside the bedroom with her left side presented. He explained that scenario resulted in Kiki's body being in the correct angle for the entry wound, exit wound, and bullet hole in the wall to be in a straight line. Ranger Barnes also stated that in this scenario, the gun would not have been in either of Kiki's hands when it was fired but rather would have been in the hand of someone else who was sitting on the bed further in the room. Ranger Barnes testified that in addition to matching the bullet's trajectory, this scenario also matched the blood evidence that

was at the scene. Ranger Barnes testified that the scenario they had developed based on the scene was not consistent with the story Stansberry had told them.

Ranger Barnes also testified that he and other officers went to a Drug Enforcement Agency gun range to test fire some of the remaining ammunition in the gun with which Kiki was shot. He said they were going to fire the ammunition into white T-shirts so they could get a "rough idea" of what stippling pattern would be present at different distances. Ranger Barnes testified that he and other officers conducted this testing themselves because neither the Texas Department of Public Safety's Crime Lab Firearms Unit nor the Tarrant County Medical Examiner's office would perform that testing. According to Ranger Barnes, the reason those agencies refused to do the testing was because the ammunition was reloaded ammunition, and thus each bullet would not fire consistently.

At the gun range, investigators fired the gun at white T-shirts from a distance of six, twelve, and twenty-four inches. Ranger Barnes testified that after he performed this testing, he concluded that the stippling pattern on Kiki did not appear to result from that gun being fired at her from close range. That is, according to Ranger Barnes, the stippling pattern on Kiki did not match the information Stansberry had provided to investigators. The prosecutor concluded her direct examination as follows:

> Q. At any point during your investigation, Ranger Barnes, were you able to make Mr. Stansberry's story fit with the physical evidence?

25

A. No, ma'am.

Q. Were you able to make it fit with what you saw in the scene?

A. No, I wasn't.

Q. Were you able to make it fit with what you saw in those ER photographs?

A. No, ma'am.

Q. Were you able to make it fit with the reconstruction at his house?

A. No, ma'am.

Q. And were you able to make it fit with the reconstruction or semi-reconstruction at the DEA range?

A. No, ma'am.

### 4. Analysis

Stansberry argues in his third point that the trial court erred by admitting Ranger Barnes's testimony that the trajectory of the bullet did not match his account that Kiki shot herself. As we have outlined above, when Ranger Barnes testified regarding his opinions about the trajectory of the bullet based on his initial investigation and observations on March 7, Stansberry objected, in the jury's presence, on the ground that he was not an expert in ballistics.[6] Although the trial court sustained the objection, Stansberry did not obtain a running objection. Immediately thereafter, Stansberry allowed Ranger Barnes to testify, without objection, that based

---

[6]Stansberry erroneously states that his objection occurred at a hearing outside the jury's presence.

on his investigation and observations on March 7, he believed the bullet's trajectory would have been different if Stansberry's story was correct.

When the State shifted its questioning to the March 12 search, Stansberry objected again—this time to the "line of questioning." The trial court overruled the objections and granted Stansberry a running objection. But the trial court only granted a running objection to those reasons that Stansberry had previously stated "outside the jury's presence," which concerned the validity of the warrant issues resolved in his second point. The jury was present when Stansberry earlier objected that Ranger Barnes was not an expert. Thus, Stansberry's running objection did not encompass the objection that Ranger Barnes was not an expert in ballistics. Although Stansberry again objected that Ranger Barnes was not an expert when he was testifying about how investigators conducted the crime scene reconstruction, Stansberry did not obtain a running objection at that point, either. And after that point, Stansberry allowed Ranger Barnes to testify, without objection, that (1) based on their scene reconstruction, investigators determined based upon the bullet's trajectory that Kiki had been shot while stepping into the master bedroom with her left side presented by someone who was sitting on the bed further in the room; and (2) that scenario was not consistent with what Stansberry had said happened.

To preserve his Rule 702 objection regarding Ranger Barnes's opinion that the trajectory of the bullet did not match his account as to how the shooting occurred, it was incumbent upon Stansberry to either continuously object each time that evidence

was offered, obtain a running objection, or raise the objection at a hearing outside jury's presence. *See Geuder*, 115 S.W.3d at 13; *Martinez*, 98 S.W.3d at 193; *Clay*, 361 S.W.3d at 766. Stansberry failed to do so and, thus, failed to preserve his third point.

For the same reasons, we conclude Stansberry failed to preserve his fourth point, in which he argues that Ranger Barnes's opinion that the stippling pattern on Kiki's body did not match his story that Kiki shot herself. While at one point Stansberry did object to Ranger Barnes's qualifications to testify about close contact gunshot wounds, he did not obtain a running objection. And after the trial court overruled his objection, Stansberry allowed Ranger Barnes to testify, without objection, that based upon the stippling testing investigators conducted at the gun range, the stippling pattern that was present on Kiki's body did not match Stansberry's story. Because he failed to either continuously assert his Rule 702 objection to Ranger Barnes's testimony regarding close-contact gunshot wounds, obtain a running objection as to that testimony, or raise the objection outside the jury's presence, we conclude Stansberry failed to preserve his fourth point. *See Geuder*, 115 S.W.3d at 13; *Martinez*, 98 S.W.3d at 193; *Clay*, 361 S.W.3d at 766.

We overrule Stansberry's third and fourth points.

## B. MEDICAL EXAMINER TASHA GREENBURG'S TESTIMONY

In his fifth point, Stansberry argues the trial court erred by admitting medical examiner Tasha Greenburg's opinion that the manner of Kiki's death was homicide.

Stansberry contends Dr. Greenburg's opinion was inadmissible under Rules 702 and 705(c) of the Texas Rules of Evidence because in reaching her conclusion, she impermissibly relied upon information that others had provided to her.

### 1. Relevant Facts

At a hearing outside the jury's presence, Dr. Greenburg, a forensic pathologist with the Tarrant County Medical Examiner, testified that she performed Kiki's autopsy on March 8, 2015, and finalized her autopsy report, which included her conclusions as to the cause and manner of Kiki's death, on August 27, 2015. Dr. Greenburg stated that in reaching those conclusions, she relied in part on a critical case review, which she explained was a conference at the medical examiner's office where all of the physicians, as well as the lead investigator, chief administrator, chief of toxicology, and chief of crime lab gather together to present a case for discussion and come to a consensus opinion about the case.

Dr. Greenburg said that she also relied in part on information law enforcement officers had provided to her that they had learned through their investigation, including information about the shooting scene and Stansberry's account of how the shooting occurred, as well as the results of the stippling pattern testing investigators had performed at the DEA gun range. Dr. Greenburg added that Tarrant County medical examiners consistently conferred with a variety of different people in reaching conclusions about the cause and manner of a person's death and that it was a common practice for medical examiners to obtain initial information from

investigators before performing an autopsy. She also stated that when she meets with investigators to obtain information relevant to an autopsy, they do not tell her how to rule on the manner of a person's death. Dr. Greenburg said that the manner-of-death determination was an internal medical examiner's decision that law enforcement officers neither dictate nor participate in.

Stansberry objected to the trial court admitting Dr. Greenburg's testimony, and the trial court overruled the objection. Once the jury returned, Stansberry again objected, the trial court overruled the objection, and Stansberry obtained a running objection.

### 2. A Medical Examiner May Consider Information Outside of an Autopsy When Determining The Cause And Manner of a Person's Death

Stansberry argues first that Dr. Greenburg's opinion was inadmissible as a matter of law because she had no statutory authority to consider any information from outside sources in making her cause and manner of death determinations. He specifically points to the code of criminal procedure's definition of the term "Autopsy," which means "a post mortem examination of the body of a person, including X-rays and an examination of the internal organs and structures after dissection, to determine the cause of death or the nature of any pathological changes that may have contributed to the death." *See* Tex. Code Crim. Proc. Ann. art. 49.01(1) (West 2018). He contends that because nothing within that definition suggests a medical examiner may seek information apart from her external and internal

30

examination of the body when making her cause and manner of death determinations, Dr. Greenburg was not authorized to consider any information that law enforcement officers provided to her when making those determinations regarding Kiki's death. And because Dr. Greenburg testified that she did so, Stansberry argues, her opinion was therefore inadmissible.

Stansberry's argument necessarily assumes that a medical examiner is required to base her cause and manner of death determinations exclusively on an autopsy. He has not provided any authority to support that assumption, and the code of criminal procedure provides to the contrary. The code provides that a medical examiner is authorized, and has the duty, to hold inquests in several situations, including cases in which the circumstances of the person's death is "such as to lead to suspicion that he came to his death by unlawful means." Tex. Code Crim. Proc. Ann. art. 49.25, § 6(a)(4) (West 2018). Under the statute, an inquest means "an investigation into the cause and circumstances of the death of a person, and a determination, made with or without a formal court hearing, as to whether the death was caused by an unlawful act or omission." *Id.* art. 49.01(2). This definition does not restrict the scope of a medical examiner's investigation to an autopsy.

Additionally, the code expressly contemplates that a medical examiner may conduct an inquest without performing an autopsy in at least some cases. For example, article 49.25, section 9(a) provides that if, as a result of her investigation, a medical examiner determines the cause of a person's death beyond a reasonable

31

doubt, she "shall file a report thereof setting forth specifically the cause of death" with the appropriate agency. *Id.* art. 49.25, § 9(a) (West 2018). It then provides:

> If in the opinion of the medical examiner an autopsy is necessary, or if such is requested by the district attorney or criminal district attorney, or county attorney where there is no district attorney or criminal district attorney, the autopsy shall be immediately performed by the medical examiner or a duly authorized deputy.

*Id.* By mandating that an autopsy shall be performed only if the medical examiner deems it necessary or another authorized official request it, it follows that article 49.25, section 9(a) authorizes a medical examiner to make a cause of death determination without performing an autopsy in cases where she deems an autopsy unnecessary and an authorized official has not requested one. The code also contemplates that a medical examiner's inquest may include information from third parties, providing that in conducting an inquest, the medical examiner "may administer oaths and take affidavits." *Id.* 49.25, § 6(c).

Thus, to the extent Stansberry argues that Dr. Greenburg's opinion was inadmissible merely because she was not authorized to consider information outside of Kiki's autopsy, we conclude that the code of criminal procedure provides otherwise.

### 3. Dr. Greenburg's Testimony as to The Manner of Death Was Sufficiently Based on Scientific, Technical, or Other Specialized Knowledge

We turn next to Stansberry's argument that even if Dr. Greenburg was authorized to obtain information outside of Kiki's autopsy, her opinion was

nevertheless inadmissible under Rule 702 of the rules of evidence. Relying on Iowa caselaw, he argues that because Dr. Greenburg, in reaching her cause and manner of death determinations, relied on the results of the stippling pattern testing investigators performed at the DEA gun range, as well as Stansberry's account of the shooting as relayed to her by investigators, her opinion was not sufficiently based on scientific, technical, or specialized knowledge such that it would assist the jury. *See Tyler v. State*, 867 N.W.2d 136, 153–165 (Iowa 2015). Assuming, without deciding, this nonbinding Iowa case is applicable here, we conclude it is distinguishable.

*Tyler* involved a mother's conviction for murdering her newborn baby. 867 N.W.2d at 143. The medical examiner, Dr. Jonathan Thompson, performed an autopsy and concluded that the cause of the child's death was "Bathtub drowning" and the manner of the child's death was homicide. *Id.* at 148–49. Dr. Thompson testified that based on the autopsy alone, he would have been unable to determine whether the baby had died by drowning. *Id.* at 149–50. He further stated that the only basis for his conclusions that the cause of death was drowning and that the manner of death was homicide was his viewing of a video of an interview the mother had given to the police, in which she stated that the baby had been born alive and that she had put him in a bathtub and turned on the water for the purpose of drowning him. *Id.* at 147, 150. Dr. Thompson confirmed that had the mother told police that the baby was stillborn, he would have classified the death as a stillbirth. *Id.* at 150. And he testified that was because the actual medical examination, medical testing, and

33

scientific testing he had performed was inconclusive. *Id.* The trial court allowed this testimony to be admitted. *Id.*

Applying Rule 5.702 of Iowa's Rules of Evidence, which is identical to our Rule 702, the Iowa supreme court concluded that Dr. Thompson's cause and manner of death opinions were inadmissible because they were not sufficiently based on scientific, technical, or other specialized knowledge so as to assist the jury. *Id.* at 164. In doing so, the court stated that "there are circumstances when a medical examiner's opinions on cause or manner of death may assist the jury, even when such opinions are based in part on witness statements or information obtained through police investigation" but that there is "no bright-line rule for determining whether a medical examiner may opine on cause or manner of death when his or her opinions are based, in whole or in part, on such information." *Id.* at 162. The court stated that, instead,

> whether a medical examiner's opinion on cause or manner of death is admissible depends on the particular circumstances of each case. For example, when a medical examiner bases his or her opinion of cause or manner of death largely on witness statements or information obtained through police investigation, such opinions would ordinarily be inadmissible under rule 5.702 because they would not assist the trier of fact. In contrast, when a medical examiner bases his or her opinion on cause or manner of death primarily on the autopsy, such opinions will likely assist the jury in understanding the evidence and would ordinarily be admissible.

*Id.* at 162–63 (citations omitted). Because Dr. Thompson had testified that his opinions as to the child's cause and manner of death were based "primarily, if not exclusively" on the mother's inconsistent and uncorroborated statements to police, as

opposed to objective medical findings, the court concluded that those opinions were not based on his scientific, technical, or other specialized knowledge and thus did not assist the trier of fact. *Id.* at 163–64. For that reason, the court concluded those opinions were inadmissible under Rule 5.702. *See id.* at 164–65.

In contrast to *Tyler*, Dr. Greenburg's testimony does not reflect that she relied exclusively or primarily on the results of the stippling pattern testing investigators performed at the DEA gun range or Stansberry's account of the shooting in forming her opinions as to the manner of Kiki's death. Dr. Greenburg testified to the jury that she performed an autopsy on Kiki. She observed that Kiki had a gunshot wound, with an entrance wound at her left upper chest and an exit wound at the right side of her back that measured a little lower than the entrance wound. Dr. Greenburg observed that if looking at the front of Kiki, the bullet traveled through the front of Kiki's body to the back in a downward, left to right trajectory and that the bullet traveled in basically a straight line. She stated that the bullet traveled through the upper lobe of Kiki's left lung, then through the root of her pulmonary artery, then through her esophagus, before grazing the lower lobe of her right lung, and ultimately exiting her back. Dr. Greenburg testified that she determined the cause of Kiki's death to be a gunshot wound to the chest.

Dr. Greenburg also testified regarding the manner of Kiki's death, which she determined was homicide. As part of her examination of Kiki's body, she attempted to determine how close the gun was to her body when it was fired. Dr. Greenburg

35

did not observe a muzzle imprint on Kiki's body, nor did she note any soot deposits. She did, however, notice sparse gunpowder tattooing on Kiki's upper chest and lower neck. She observed that there was no gunpowder tattooing on either of Kiki's arms.

When the prosecutor asked whether it would help the jury if she could demonstrate some of the possible ways Kiki could have shot herself, Dr. Greenburg said that it would. Dr. Greenburg explained that in the course of her investigation, she had attempted to recreate different shooting scenarios on her own and with people in her office in order to understand how the shooting occurred. Dr. Greenburg performed an in-court demonstration in front of the jury where she demonstrated the angle at which the gun must have been situated in order to create a bullet trajectory that matched Kiki's wound. She further testified that based on her autopsy, she did not believe the angle she had demonstrated was consistent with someone shooting herself, whether by accident or suicide. Her testimony continued:

> [PROSECUTOR:] Q. Okay. Just use your right hand and point the gun towards your chest at the angle at which this would have had to occur. Do your autopsy findings support this scenario occurring?
>
> A. No.
>
> Q. Now put the gun in your left hand. This is the last one we'll do. And hold the trigger or -- with your thumb, if that makes sense. Hold it out as far as you possibly can. And the angle at which the entry-to-exit wound would have occurred, is that approximately correct?
>
> A. Yes.
>
> Q. If someone did this, whether it is accident or suicide, what would you expect to see on their arms right there?

A. Well, we talked about the fact that coming from the barrel of the gun is going to be some soot and also that gunpowder. So within this vicinity from the barrel of the gun those particles should be deposited on a surface that is near it.

Q. Did you see any of that on [Kiki]?

A. No.

Dr. Greenburg also testified that she had conducted the critical case review, that it involved other medical examiners in her office, and that they reached a consensus that the manner of Kiki's death was homicide. Dr. Greenburg explained that the factors they had considered in making that determination included the characteristics of the wound that

> allow us as forensic pathologists to look at that wound and give our interpretation of what we call the wound ballistics and look at the path of the wound in the body and also look at anything relating to the scene about where that projectile may have been recovered to put together a scenario for how that happened, as well as looking at possible ways for that injury to have occurred.

She further testified that although she had met with law enforcement between the time of the autopsy and the time she completed her report, she did not allow them to dictate what her opinion needed to be, stating, "[t]hat's not the way we work."

Thus, unlike *Tyler*, Dr. Greenburg's testimony does not reflect her manner-of-death conclusion was based primarily or exclusively on uncorroborated information communicated to her by third parties as opposed to her own scientific, technical, or other specialized knowledge. *See id.* at 164–65. Rather, her testimony reflects that

determination was based on her examination of Kiki's body, including the wound pattern and trajectory of the bullet and her own attempts to recreate shooting scenarios that would result in the same wound pattern, trajectory, lack of soot deposit, and sparse gunpowder tattooing that she observed during the autopsy. Accordingly, assuming the Iowa supreme court's analysis in *Tyler* is applicable in construing Rule 702 here, because Dr. Greenburg's manner-of-death opinion was not based primarily or exclusively on nonscientific, nontechnical, or nonspecialized knowledge such that it was unhelpful to the jury, we conclude the trial court did not abuse its discretion by admitting her testimony regarding the manner of Kiki's death. *See id.*

We overrule Stansberry's fifth point.

## IV. CONCLUSION

Having overruled all of Stansberry's points, we affirm the trial court's judgment. Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 13, 2018

38